Docket Nos. 105741, 105745 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

ABIGAILE LEBRON, a Minor, *et al.*, Appellees, v. GOTTLIEB
MEMORIAL HOSPITAL *et al.*, Appellants.

*Opinion filed February 4, 2010.*

CHIEF JUSTICE FITZGERALD delivered the judgment of the
court, with opinion.

Justices Freeman, Kilbride and Burke concurred in the judgment
and opinion.

Justice Karmeier concurred in part and dissented in part, with
opinion, joined by Justice Garman.

Justice Thomas took no part in the decision.

## OPINION

At issue in this appeal is the constitutionality of section 2–1706.5
of the Code of Civil Procedure (Code) (735 ILCS 5/2–1706.5 (West
2008)), which was adopted as part of Public Act 94–677 (Act) (see
Pub. Act 94–677, §330, eff. August 25, 2005). Section 2–1706.5 sets
certain caps on noneconomic damages in medical malpractice cases.
Relying on this court's decision in *Best v. Taylor Machine Works*,
179 Ill. 2d 367 (1997), the circuit court of Cook County ruled that the
statutory caps violate the separation of powers clause of the Illinois
Constitution (Ill. Const. 1970, art. II, §1) and declared the entire Act

invalid, pursuant to its inseverability provision (Pub. Act 94–677, §995, eff. August 25, 2005).

For the reasons discussed below, we affirm in part and reverse in part the judgment of the circuit court, and remand this matter for further proceedings.

BACKGROUND

In November 2006, plaintiffs Abigaile Lebron (Abigaile), a minor, and her mother, Frances Lebron (Lebron), filed a medical malpractice and declaratory judgment action in the Cook County circuit court against defendants Gottlieb Memorial Hospital, Roberto Levi-D'Ancona, M.D., and Florence Martinoz, R.N. According to the five-count amended complaint, Lebron was under the care of Dr. Levi-D'Ancona during her pregnancy. On October 31, 2005, Lebron was admitted to Gottlieb, where Dr. Levi-D'Ancona delivered Abigaile by Caesarean section. Martinoz assisted in the delivery and provided the principal nursing care from the time of Lebron's admission. In counts I through IV, plaintiffs alleged that as the direct and proximate result of certain acts and omissions by defendants, Abigaile sustained numerous permanent injuries including, but not limited to, "severe brain injury, cerebral palsy, cognitive mental impairment, inability to be fed normally such that she must be fed by a gastronomy tube, and inability to develop normal neurological function."

In count V, relevant to this appeal, plaintiffs sought a judicial determination of their rights with respect to Public Act 94–677 and a declaration that certain provisions of the Act, applicable to plaintiffs' cause of action, violate the Illinois Constitution. Although plaintiffs challenged several provisions of the Act, at issue here is plaintiffs' challenge to the caps on noneconomic damages set forth in section 2–1706.5 of the Code.[1] Plaintiffs alleged that Abigaile "has

_____

[1] Plaintiffs also challenged the Act's amendment of section 2–622 of the Code that changed the certificate of merit requirements for medical malpractice actions; the Act's adoption of section 2–1704.5 that, *inter alia*, permits future medical expenses and costs of life care to be paid through purchase of an annuity; the Act's amendment of section 8–1901 that

sustained disability, disfigurement, pain and suffering to the extent that damages for those injuries will greatly exceed the applicable limitations on noneconomic damages under Public Act 94–677." Citing *Best*, plaintiffs alleged that the limitation on damages violates the separation of powers clause of the Illinois Constitution (Ill. Const. 1970, art. II, §1) by permitting the General Assembly to supplant the judiciary's authority in determining whether a remittitur is appropriate under the facts of the case. Again citing to *Best*, plaintiffs further alleged that the limitation on non-economic damages constitutes improper special legislation (Ill. Const. 1970, art. IV, §13) in that "the restrictions on noneconomic damages grant limited liability specially and without just cause to a select group of health care provider[s]." Plaintiffs additionally alleged that the damages caps violate Abigaile's right to a trial by jury (Ill. Const. 1970, art. I, §13), due process (Ill. Const. 1970, art. I, §2), equal protection (Ill. Const. 1970, art. I, §2), and a certain and complete remedy (Ill. Const. 1970, art. I, §12).[2]

Plaintiffs filed a motion for partial judgment on the pleadings as to count V, and Gottlieb and Martinoz countered with a motion for partial summary judgment on count V. Dr. Levi-D'Ancona moved for judgment on the pleadings as to his counterclaim seeking a declaration that the challenged statutory provisions do not violate the Illinois Constitution. After briefing and oral argument, the circuit court granted plaintiffs' motion for partial judgment on the pleadings,

---

established an evidentiary rule concerning a health-care provider's admission of liability; and the Act's amendment of section 8–2501 that changed the expert witness standards in medical malpractice actions. See Pub. Act 94–677, §330, eff. August 25, 2005, amending 735 ILCS 5/2–622, 8–1901, 8–2501, and adding 735 ILCS 5/2–1704.5.

[2]Anticipating other challenges to Public Act 94–677, the presiding judge of the Law Division of the Cook County circuit court ordered that all pending and subsequently filed motions in any case challenging the constitutionality of the Act be consolidated before the same judge presiding over plaintiffs' case. Thus, Lebron v. Gottlieb became the lead case. The record identifies two other cases pending in Cook County in which a party challenged the constitutionality of the Act: Alexander v. Nacopoulos, No. 07– L–2207, and Zago v. Resurrection Medical Center, No. 07–L–1720.

and denied Dr. Levi-D'Ancona's motion for judgment on the pleadings as to his counterclaim to the extent it sought a declaration that the damages caps are consistent with the separation of powers clause. The circuit court did not expressly deny the motion for partial summary judgment as to count V filed by Gottlieb and Martinoz.

The circuit court determined that the statutory cap on noneconomic damages in section 2–1706.5, like the statutory damages cap at issue in *Best*, operates as a legislative remittitur in violation of the separation of powers clause of the Illinois Constitution (Ill. Const. 1970, art. II, §1). Based on the Act's inseverability provision (Pub. Act 94–677, §995, eff. August 25, 2005), the circuit court invalidated the Act in its entirety. The circuit court declined to consider plaintiffs' other constitutional challenges to the Act. The circuit court later amended its order to add the findings required by Supreme Court Rule 18 (210 Ill. 2d R. 18) and, on the motion of Gottlieb and Martinoz, made a Rule 304(a) finding of appealability (210 Ill. 2d R. 304(a)).

Pursuant to Supreme Court Rule 302(a) (210 Ill. 2d R. 302(a)), Gottlieb and Martinoz, and Dr. Levi-D'Ancona, filed appeals directly with this court. We consolidated these appeals for review, and allowed the Illinois Attorney General to intervene to defend the constitutionality of the Act. See 210 Ill. 2d R. 19. We also allowed numerous individuals and organizations to file briefs *amicus curiae*. See 210 Ill. 2d R. 345.[3]

---

[3] *Amicus curiae* briefs in support of plaintiffs were received from the American Bar Association; Chicago Bar Association and Illinois State Bar Association; Citizen Action/Illinois and Illinois Alliance for Retired Americans; Illinois AFL-CIO and the Chicago Federation of Labor; Illinois Trial Lawyers Association; National Association for the Advancement of Colored People and Cook County Bar Association; Professors Neil Vidmar, Tom Baker, Ralph L. Brill, Martha Chamallas, Stephen Daniels, Thomas A. Eaton, Theodore Eisenberg, Neal Feigenson, Lucinda M. Finley, Marc Galanter, Valerie P. Hans, Michael Heise, Edward J. Kionka, Thomas H. Koenig, Herbert M. Kritzer, David I. Levine, Nancy S. Marder, Joanne Martin, Frank M. McClellan, Deborah Jones Merritt, Philip G. Peters, Jr., James T. Richardson, Charles Silver, and Richard W. Wright; and the Women's Bar Association of Illinois. *Amicus curiae* briefs in support of

ANALYSIS

I

This case comes to us following the grant of plaintiffs' motion for judgment on the pleadings. See 735 ILCS 5/2–615(e) (West 2008). " '[A] motion for judgment on the pleadings is like a motion for summary judgment limited to the pleadings.' " *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 138 (1999), quoting 3 R. Michael, Illinois Practice §27.2, at 494 (1989), citing *Tompkins v. France*, 21 Ill. App. 2d 227 (1959). Judgment on the pleadings is proper if the pleadings disclose no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *M.A.K. v. Rush-Presbyterian-St. Luke's Medical Center*, 198 Ill. 2d 249, 255 (2001); *Employers Insurance of Wausau*, 186 Ill. 2d at 138. We review the grant of judgment on the pleadings *de novo*. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 385 (2005).

*De novo* review is also appropriate because the circuit court's grant of judgment on the pleadings rests on its determination that section 2–1706.5 of the Code violates the Illinois Constitution. Whether a statute is unconstitutional is a question of law subject to *de novo* review. *People v. Johnson*, 225 Ill. 2d 573, 584 (2007). We are mindful that section 2–1796.5, like every statute, enjoys a strong presumption of constitutionality and that the burden of rebutting this presumption rests with the party challenging the statute–here, plaintiffs. *In re Marriage of Miller*, 227 Ill. 2d 185, 195 (2007); *In re Estate of Jolliff*, 199 Ill. 2d 510, 517 (2002).

The circuit court ruled that section 2–1706.5 is unconstitutional both on its face and as applied to plaintiffs. A statute is facially invalid only if no set of circumstances exists under which the statute would be valid. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306

---

defendants were received from Advocate Health and Hospitals Corporation; American Medical Association and Illinois State Medical Society; the Cook County State's Attorney; Illinois Hospital Association, American Hospital Association, Illinois Catholic Health Association, and Illinois Rural Health Association; and Loyola University Medical Center and Loyola University Physician Foundation.

(2008). Therefore, the circuit court's ruling that the statute is facially invalid negates any notion that the statute could be validly applied to these plaintiffs and the court's "as applied" ruling was unnecessary. Moreover, when there has been no evidentiary hearing and no findings of fact, the constitutional challenge must be facial. *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004), citing *Reno v. Flores*, 507 U.S. 292, 300-01, 123 L. Ed. 2d 1, 15-16, 113 S. Ct. 1439, 1446 (1993). Accordingly, we reverse the circuit court's "as applied" ruling and limit our review to whether section 2–1706.5 is facially invalid. See *John M.*, 212 Ill. 2d at 268. We turn now to the statute, itself.

Section 2–1706.5 provides in relevant part:

> "(a) In any medical malpractice action or wrongful death action based on medical malpractice in which economic and non-economic damages may be awarded, the following standards shall apply:
>
>> (1) In a case of an award against a hospital and its personnel or hospital affiliates, as defined in Section 10.8 of the Hospital Licensing Act, the total amount of non-economic damages shall not exceed $1,000,000 awarded to all plaintiffs in any civil action arising out of the care.
>>
>> (2) In a case of an award against a physician and the physician's business or corporate entity and personnel or health care professional, the total amount of non-economic damages shall not exceed $500,000 awarded to all plaintiffs in any civil action arising out of the care.
>>
>> (3) In awarding damages in a medical malpractice case, the finder of fact shall render verdicts with a specific award of damages for economic loss, if any, and a specific award of damages for non-economic loss, if any.
>
> The trier of fact shall not be informed of the provisions of items (1) and (2) of this subsection (a)." 735 ILCS 5/2–1706.5 (West 2008).

The limitation on noneconomic damages set forth in section 2–1706.5 is one of several "significant reforms" to the civil justice system the General Assembly adopted in response to a "health-care crisis" in this state. Pub. Act 94–677, §101(4), eff. August 25, 2005.

According to the legislative findings set forth in the Act, the rising cost of medical liability insurance increases the financial burdens on physicians and hospitals and is believed to have contributed to a reduction of available medical care in portions of Illinois. Pub. Act 94–677, §§101(1), (2), eff. August 25, 2005. The General Assembly determined:

> "[T]he current medical malpractice situation requires reforms that enhance the State's oversight of physicians and ability to discipline physicians, that increase the State's oversight of medical liability insurance carriers, that reduce the number of nonmeritorious healing art malpractice actions, that limit non-economic damages in healing art malpractice actions, that encourage physicians to provide voluntary services at free medical clinics, that encourage physicians and hospitals to continue providing health care services in Illinois, and that encourage physicians to practice in medical care shortage areas." Pub. Act 94–677, §101(5), eff. August 25, 2005.

In addition to the caps on noneconomic damages, the reforms adopted by the legislature included changes to the Illinois Insurance Code (Pub. Act 94–677, §310, eff. August 25, 2005), the Medical Practice Act of 1987 (Pub. Act 94–677, §315, eff. August 25, 2005), and the Good Samaritan Act (Pub. Act 94–677, §340, eff. August 25, 2005), as well as other changes to the Code (Pub. Act 94–677, §330, eff. August 25, 2005), and new legislation known as the "Sorry Works! Pilot Program Act" (Pub. Act 94–677, art. 4, eff. August 25, 2005). We need not delve into the details of these reforms because the focus of this appeal is one particular reform: the limitation on noneconomic damages codified in section 2–1706.5.

The circuit court invalidated the statute for the sole reason that, pursuant to our decision in *Best*, the limitation on noneconomic damages in section 2–1706.5 violates the separation of powers clause of the Illinois Constitution (Ill. Const. 1970, art. II, §1). Defendants argue that the statute at issue in *Best* is distinguishable from the present statute and that the circuit court's ruling represents an unjustified expansion of *Best*. Defendants maintain that the damages provision in section 2–1706.5 constitutes a valid exercise of the General Assembly's police power in response to a public threat, as

reflected in the legislative findings, and that under our precedents, the statute does not offend separation of powers principles. Plaintiffs continue to argue that *Best* is controlling and that neither this court's precedents, nor the legislative findings on which defendants rely, can save the statute. We consider the *Best* decision in detail.

In *Best*, this court considered constitutional challenges to several provisions of Public Act 89–7, commonly referred to as the Tort Reform Act of 1995 or the Civil Justice Reform Amendments of 1995. Pub. Act 89–7, eff. March 9, 1995. Among the challenged provisions was a $500,000 cap on noneconomic damages. Codified at section 2–1115.1(a) of the Code, this provision stated:

> "In all common law, statutory or other actions that seek damages on account of death, bodily injury, or physical damage to property based on negligence, or product liability based on any theory or doctrine, recovery of non-economic damages shall be limited to $500,000 per plaintiff. There shall be no recovery for hedonic damages." 735 ILCS 5/2–1115.1(a) (West 1996).

The statute defined "non-economic damages" as "damages which are intangible, including but not limited to damages for pain and suffering, disability, disfigurement, loss of consortium, and loss of society." 735 ILCS 5/2–1115.2(b) (West 1996). The statute defined "economic damages," which were not capped, as "all damages which are tangible, such as damages for past and future medical expenses, loss of income or earnings and other property loss." 735 ILCS 5/2–1115.2(a) (West 1996). The sum of noneconomic and economic damages constituted "compensatory damages." 735 ILCS 5/2–1115.2(c) (West 1996). Thus, damages which were intended to make a person whole were limited by section 2–1115.1. *Best*, 179 Ill. 2d at 384.

Before considering the specific constitutional challenges to this provision, we noted that the cap on noneconomic damages was supported by several legislative findings which, as we later recognized, were entitled to "great deference." *Best*, 179 Ill. 2d at 389. These findings declared that:

> "(1) limiting noneconomic damages will improve health care in rural Illinois, (2) more than 20 states limit noneconomic

damages, (3) the cost of health care has decreased in those states, (4) noneconomic losses have no monetary dimension, and no objective criteria or jurisprudence exists for assessing or reviewing noneconomic damages awards, (5) such awards are highly erratic and depend on subjective preferences of the trier of fact, (6) highly erratic noneconomic damages awards subvert the credibility of such awards and undercut the deterrent function of tort law, (7) such awards must be limited to provide consistency and stability for all parties and society and (8) *** limiting noneconomic damages was the most effective step toward legislative reform of tort law because it reduces litigation costs and expedites settlement." *Best*, 179 Ill. 2d at 385.

We further noted that the preamble to Public Act 89–7 identified several "purposes" of the damages cap: reducing the cost of health care, increasing accessibility to health care, promoting consistency in awards, reestablishing the credibility of the civil justice system, establishing parameters for noneconomic damages, protecting the economic health of the state by decreasing systemic costs, and ensuring the affordability of insurance. *Best*, 179 Ill. 2d at 385.

Proceeding from the premise that our task was to determine the constitutionality of the statute, and not its wisdom (*Best*, 179 Ill. 2d at 390), we first considered the plaintiffs' special legislation challenge (Ill. Const. 1970, art. IV, §13). We observed that the purpose of the special legislation clause "is to prevent arbitrary legislative classifications that discriminate in favor of a select group without a sound, reasonable basis." *Best*, 179 Ill. 2d at 391. The plaintiffs argued that the statute impermissibly penalized the most severely injured persons whose award for noneconomic damages would likely exceed $500,000, but for the statutory cap, and that the statute arbitrarily benefitted certain tortfeasors by relieving them of liability for fully compensating injured persons. The plaintiffs relied on *Wright v. Central Du Page Hospital Ass'n*, 63 Ill. 2d 313 (1976) (holding that a $500,000 limit on compensatory damages in medical malpractice actions was arbitrary and violated the special legislation clause), *Grace v. Howlett*, 51 Ill. 2d 478 (1972) (holding that a statute that limited recovery for certain automobile accident victims was an arbitrary and unreasonable classification in violation of the special

legislation clause), and *Grasse v. Dealer's Transport Co.*, 412 Ill. 179 (1952) (holding that a workers' compensation provision violated the special legislation clause by creating unreasonable classifications in which the plaintiff's ability to recover complete compensation was determined by fortuitous events).

We agreed with the plaintiffs that under *Wright*, *Grace* and *Grasse* the automatic $500,000 limit on noneconomic damages was arbitrary and violated the special legislation clause. *Best*, 179 Ill. 2d at 406. Although agreeing with the defendants that noneconomic injuries are difficult to assess, we determined that such difficulty was not alleviated by imposing an arbitrary damages limitation in all cases, without regard to the facts or circumstances. *Best*, 179 Ill. 2d at 406. Indeed, we determined that the damages limitation actually undermined the statute's stated goal of providing consistency and rationality to the civil justice system. *Best*, 179 Ill. 2d at 406. We also rejected the defendants' argument that the legislature's interest in reducing the systemic costs of tort liability was sufficient to overcome the plaintiffs' special legislation challenge, noting that the entire burden of any cost savings would impermissibly rest on one class of injured plaintiffs. *Best*, 179 Ill. 2d at 407.

We continued our analysis of section 2–1115.1 by considering the plaintiffs' argument that section 2–1115.1 also violated the separation of powers clause (Ill. Const. 1970, art. II, §1). The plaintiffs argued that the statute invaded the province of the judiciary to assess, on a case-by-case basis, whether a jury's award is excessive, by imposing a one-size-fits-all legislative remittitur. The defendants countered that the statutory cap simply set an outer parameter by which subjective damages were limited and did not displace traditional judicial functions.

We explained that the purpose of the separation of powers clause " 'is to ensure that the whole power of two or more branches of government shall not reside in the same hands.' " *Best*, 179 Ill. 2d at 410, quoting *People v. Walker*, 119 Ill. 2d 465, 473 (1988). "Each branch of government has its own unique sphere of authority that cannot be exercised by another branch." *Best*, 179 Ill. 2d at 410. Thus, "the legislature is prohibited from enacting laws that unduly infringe upon the inherent powers of judges." *Best*, 179 Ill. 2d at 411. Though recognizing that the separation between the three branches of

government is "not absolute and unyielding" and may "overlap," we emphasized that the determination of whether a statute violates the separation of powers clause rests with the judiciary. *Best*, 179 Ill. 2d at 411.

We also reviewed the doctrine of remittitur, which has long been recognized as a part of Illinois law. *Best*, 179 Ill. 2d at 412. We noted that, for over a century, application of this doctrine has been a traditional and inherent power of the judicial branch, to be exercised in appropriate circumstances to correct an excessive jury verdict, and that its application presents a question of law for the court. *Best*, 179 Ill. 2d at 411-12. Where a jury verdict " 'falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience,' " a court has a duty to correct the verdict by ordering a remittitur, with the plaintiff's consent. *Best*, 179 Ill. 2d at 412, quoting *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997). If consent is not given, the court has a duty to order a new trial. *Best*, 179 Ill. 2d at 413. Whether a remittitur should be ordered is necessarily considered on a case-by-case basis. That is, the court must carefully examine the particular evidence and circumstances of the case to determine whether it must override the jury's verdict. *Best*, 179 Ill. 2d at 413.

In *Best*, we concluded that, although the legislature may limit certain types of damages, such as damages recoverable in statutory causes of action (*Best*, 179 Ill. 2d at 415), the limitation on damages in section 2–1115.1 violated the separation of powers clause:

> "[S]ection 2–1115.1 undercuts the power, and obligation, of the judiciary to reduce excessive verdicts. In our view, section 2–1115.1 functions as a 'legislative remittitur.' Unlike the traditional remittitur power of the judiciary, the legislative remittitur of section 2–1115.1 disregards the jury's careful deliberative process in determining damages that will fairly compensate injured plaintiffs who have proven their causes of action. The cap on damages is mandatory and operates wholly apart from the specific circumstances of a particular plaintiff's noneconomic injuries. Therefore, section 2–1115.1 unduly encroaches upon the fundamentally judicial prerogative of determining whether a jury's assessment of damages is

-11-

excessive within the meaning of the law." *Best*, 179 Ill. 2d at 413-14.

We also concluded that section 2–1115.1 unduly expanded the remittitur doctrine by forcing a successful plaintiff to forgo part of the jury award, "in clear violation of the well-settled principle that a trial court does not have authority to reduce a damages award by entry of a remittitur if the plaintiff objects or does not consent." *Best*, 179 Ill. 2d at 414.

After considering constitutional challenges to other portions of Public Act 89–7 and invalidating several provisions (*Best*, 179 Ill. 2d at 459), we ultimately held the act void in its entirety (*Best*, 179 Ill. 2d at 467). We concluded that what remained of Public Act 89–7 could not be independently enforced. *Best*, 179 Ill. 2d at 467. In the course of our analysis, we noted that the General Assembly considered the cap on noneconomic damages essential to the tort reform scheme. *Best*, 179 Ill. 2d at 465.

Before turning to the parties' arguments regarding the applicability of *Best* to the present litigation, we consider defendants' contention that the separation of powers analysis in *Best* was unnecessary to the disposition of that case and is therefore *dicta* entitled to little weight. See *Best*, 179 Ill. 2d at 471 (Bilandic, J., specially concurring) (declining to join the separation of powers analysis because it was "wholly unnecessary and constitutes *dicta*"); *Best* 179 Ill. 2d at 481 (Miller, J., concurring in part and dissenting in part) (stating that the separation of powers analysis "is entirely unnecessary, given the majority's prior holding that the same measure is invalid special legislation").

We agree that the separation of powers analysis in *Best* was not necessary to our decision. The court had already determined that section 2–1115.1 violated the special legislation clause; a further reason for finding the statute unconstitutional was not required. We disagree, however, that our opinion on this matter is mere *dicta* entitled to little weight. As this court has explained, *dictum* is of two types: *obiter dictum* and judicial *dictum*. *People v. Williams*, 204 Ill. 2d 191, 206 (2003). "*Obiter dictum*," frequently referred to as simply "*dictum*," is a remark or opinion that a court uttered as an aside. *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 277 (2009); *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993). *Obiter dictum* is not

essential to the outcome of the case, is not an integral part of the opinion, and is generally not binding authority or precedent within the *stare decisis* rule. *Exelon*, 234 Ill. 2d at 277. "In contrast, 'an expression of opinion upon a point in a case argued by counsel *and deliberately passed upon by the court*, though not essential to the disposition of the cause, if *dictum*, is a judicial *dictum*. [Citation.] \*\*\* [A] judicial *dictum* is entitled to much weight, and should be followed unless found to be erroneous.' (Emphasis added.)" *Exelon*, 234 Ill. 2d at 277-78, quoting *Cates*, 156 Ill. 2d at 80. See also *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537, 69 S. Ct. 1235, 1237, 93 L. Ed. 1524, 1526 (1949) ("where a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*").

Although the separation of powers discussion in *Best* was not essential to our disposition, the issue was briefed by the parties and "deliberately passed upon" by this court. Our analysis, summarized above, examined the nature of the separation of powers doctrine and the interplay between the three branches of government; the contours of the remittitur doctrine and its place in Illinois law; and the effect of the statutory cap on the trial court's inherent authority to correct excessive verdicts. Further, our conclusion was expressed as a holding. *Best*, 179 Ill. 2d at 415; see also *Unzicker v. Kraft Food Ingredients Corp.*, 203 Ill. 2d 64, 93 (2002) (stating that in *Best*, we "held" that section 2–1115.1 of the Code was an unconstitutional legislative remittitur). Our opinion on this matter can hardly be considered an "aside" and, if a *dictum*, is a judicial *dictum*. Accordingly, it is entitled to much weight and should be followed unless found to be erroneous. See *Exelon*, 234 Ill. 2d at 278.

Defendants do not argue that the separation of powers analysis in *Best* is necessarily erroneous. Rather, they argue that the statute at issue here, section 2–1706.5, is distinguishable from the statute invalidated in *Best*, section 2–1115.1. Defendants maintain that while section 2–1115.1 was part of a broad-based effort to reduce systemwide litigation costs, section 2–1706.5 is narrowly tailored to address a specific issue: the health-care crisis. Based on this distinction, defendants argue that *Best* is not controlling and section 2–1706.5 does not unduly encroach upon the judiciary.

We agree with defendants that the scope of the statute at issue in *Best* was much broader than the statute we examine here. The

damages cap in section 2–1115.1 applied to all actions, whether based on the common law or statute, that sought damages "on account of death, bodily injury, or physical damage to property based on negligence, or product liability based on any theory or doctrine." 735 ILCS 5/2–1115.1(a) (West 1996). In contrast, the damages cap in section 2–1706.5 applies to "any medical malpractice action or wrongful death action based on medical malpractice." 735 ILCS 5/2–1706.5(a) (West 2008). Notwithstanding this difference, the encroachment upon the inherent power of the judiciary is the same in the instant case as it was in *Best*.

Under section 2–1706.5, the court is required to override the jury's deliberative process and reduce any noneconomic damages in excess of the statutory cap, irrespective of the particular facts and circumstances, and without the plaintiff's consent. Section 2–1706.5 thus violates the separation of powers clause because it "unduly encroaches upon the fundamentally judicial prerogative of determining whether a jury's assessment of damages is excessive within the meaning of the law." *Best*, 179 Ill. 2d at 414. Section 2–1706.5, like section 2–1115.1, effects an unconstitutional legislative remittitur. The fact that the legislative remittitur operates in perhaps fewer cases under section 2–1706.5 than it would have under section 2–1115.1 does not extinguish the constitutional violation.

The Attorney General argues, however, that the damages cap at issue in *Best* was found by this court to be "arbitrary" and "not rationally related to a legitimate government interest" (*Best*, 179 Ill. 2d at 408), whereas the present damages cap is rationally related to the Act's narrow aim of addressing the mounting crisis in access to health care by stemming the cost of malpractice insurance. See Pub. Act 94–677, §101(4), eff. August 25, 2005 (identifying the limitation on noneconomic damages as one of the significant reforms to the civil justice system designed to combat the health-care crisis). This argument conflates our special legislation analysis in *Best* and our separation of powers analysis in that case.

In *Best*, we first considered the plaintiffs' special legislation challenge and determined that the rational basis test was appropriate. *Best*, 179 Ill. 2d at 393. Under this test, " 'a court must determine whether the statutory classification is rationally related to a legitimate

State interest.' " *Best*, 179 Ill. 2d at 393, quoting *In re Petition of the Village of Vernon Hills*, 168 Ill. 2d 117, 123 (1995). We ultimately concluded that the damages cap was arbitrary and was not rationally related to a legitimate state interest. *Best*, 179 Ill. 2d at 406-08. We did not, however, incorporate that holding, rely upon it, or even reference it in our separation of powers discussion, nor was it necessary to do so. *Best*, 179 Ill. 2d at 410-15.

The separation of powers clause prohibits one branch of government from exercising "powers properly belonging to another." Ill. Const. 1970, art. II, §1. Thus, the inquiry under the separation of powers clause is not whether the damages cap is rationally related to a legitimate government interest but, rather, whether the legislature, through its adoption of the damages cap, is exercising powers properly belonging to the judiciary. In other words, does the statute unduly encroach on the judiciary's "sphere of authority" (*Allegis Realty Investors v. Novak*, 223 Ill. 2d 318, 334 (2006); *Best*, 179 Ill. 2d at 410)) or "impede the courts in the performance of their functions" (*Best*, 179 Ill. 2d at 443)? The rational basis test is not part of that legal determination. Numerous cases from this court illustrate the distinction between a separation of powers analysis and a special legislation analysis. See, *e.g.*, *In re Estate of Jolliff*, 199 Ill. 2d 510 (2002); *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21 (2001); *DeLuna v. St. Elizabeth's Hospital*, 147 Ill. 2d 57 (1992); *Bernier v. Burris*, 113 Ill. 2d 219 (1986).

For similar reasons, we reject defendants' argument that section 2–1706.5 should not be deemed invalid because, unlike the statute in *Best* which burdened one class of plaintiffs (*Best*, 179 Ill. 2d at 407), the Act here balances the benefits and burdens of resolving the health-care crisis among insurers, health-care providers and patients. This argument, like the one before it, confuses our separation of powers and special legislation analyses. Our observation in *Best* regarding the burden of any cost savings effected by the damages cap was made in the course of our special legislation discussion. We stated:

> "[W]e are unable to discern any connection between the automatic reduction of one type of compensatory damages awarded to one class of injured plaintiffs and a savings in the systemwide costs of litigation. Even assuming that a

-15-

systemwide savings in costs were achieved by the cap, the *prohibition against special legislation* does not permit the entire burden of the anticipated cost savings to rest on one class of injured plaintiffs. [Citation.] We therefore reject defendants' systemic costs rationale as a basis for upholding section 2–1115.1." (Emphasis added.) *Best*, 179 Ill. 2d at 407.

We did not, in the context of examining the plaintiffs' separation of powers argument, consider whether the statute burdened a particular group. See *Best*, 179 Ill. 2d at 410-16. Consideration of that issue was unnecessary because, as explained above, a separation of powers analysis asks whether the statute unduly infringes upon the judiciary's sphere of authority. Thus, a proper separation of powers analysis of section 2–1706.5 does not consider whether the Act balances the benefits and burdens of resolving the health-care crisis or burdens a particular group. The intrusion on the judicial authority effected by section 2–1706.5 is no less simply because other provisions of the Act may impose burdens on parties other than plaintiffs.

In a related vein, the Attorney General posits that section 2–1706.5 is but one part of a massive "multidimensional" response to the health-care crisis which requires all interested parties–insurers, medical professionals and health-care consumers–to make tradeoffs and sacrifices. According to the Attorney General, the Act, through a number of interrelated measures, constitutes an equitable means of ensuring that everyone who stands to benefit from a resolution of the health-care crisis contributes to its resolution. The Attorney General cites to the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2008)) as an example of a multidimensional exercise of the General Assembly's police power which, although modifying the common law, has been upheld by this court in a long line of cases. See *Duley v. Caterpillar Tractor Co.*, 44 Ill. 2d 15 (1969); *Moushon v. National Garages, Inc.*, 9 Ill. 2d 407 (1956); *Grand Trunk Western Ry. Co. v. Industrial Comm'n*, 291 Ill. 167 (1919); *Matthiessen & Hegeler Zinc Co. v. Industrial Board*, 284 Ill. 378 (1918). The Attorney General argues that section 2–1706.1, like the Workers' Compensation Act, constitutes a legitimate exercise of the General Assembly's police power.

Plaintiffs dispute the Attorney General's contention that the Act requires all stakeholders to make a sacrifice. Plaintiffs argue that hospitals gain enormous benefits under the Act, but are not required to give anything in return. This aside, plaintiffs further respond that the multidimensional nature of a legislative enactment does not determine whether the enactment is constitutional, and that the statutes at issue in *Grasse*, *Wright*, and *Best* were deemed invalid even though each statute was part of a multidimensional enactment. According to plaintiffs, whether the Act is multidimensional is of no constitutional significance. We agree with plaintiffs.

In *Grasse*, we held unconstitutional a provision of the Workers' Compensation Act–the very legislation the Attorney General posits is an example of a multidimensional enactment. *Grasse*, 412 Ill. at 200. In *Wright*, we held unconstitutional a statutory damages cap, without regard to the fact that it was but one provision of what may be called a multidimensional act revising the law in relation to medical malpractice. *Wright*, 63 Ill. 2d at 318, 329-30. Similarly, in *Best*, we held a damages cap unconstitutional, notwithstanding that it was but one provision of an "integrated 'reform package.' " *Best*, 179 Ill. 2d at 465. As these cases demonstrate, though nothing precludes the General Assembly from adopting a so-called "multidimensional" response to a threat to the public welfare, the multidimensional character of a statute does not preclude a finding by this court that the statute is unconstitutional.

Defendants further argue that our decision in *Unzicker v. Kraft Food Ingredients Corp.*, 203 Ill. 2d 64 (2002), which rejected a separation of powers challenge based on *Best*, teaches that the separation of powers clause does not prevent the General Assembly from dictating when a defendant can be liable for the full amount of a jury's verdict and that application of *Unzicker* to the present case demonstrates that section 2–1706.5 does not operate as a legislative remittitur. Plaintiffs counter that if *Unzicker* has any relevance here, it supports the circuit court's judgment.

In *Unzicker* we considered the constitutionality of section 2–1117 of the Code (735 ILCS 5/2–1117 (West 1994)), which modified the common law rule of joint and several liability. Under the common law, a plaintiff could recover compensation for the full amount of his or her injury from any responsible defendant. *Unzicker*, 203 Ill. 2d at

Pursuant to section 2–1117, however, any tortfeasor whose percentage of fault the trier of fact determined to be "less than 25% of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant who could have been sued by the plaintiff, shall be severally liable" for the plaintiff's nonmedical damages. 735 ILCS 5/2–1117 (West 1994). Relying on the separation of powers analysis in *Best*, the plaintiffs argued that the change in the common law rule of joint and several liability amounted to an unconstitutional legislative remittitur. We rejected this argument, noting that, unlike the statute in *Best*, section 2–1117 did not set a cap on damages. *Unzicker*, 203 Ill. 2d at 94. Rather, section 2–1117 merely determined "when a defendant can be held liable for the full amount of a jury's verdict and when a defendant is liable only in an amount equal to his or her percentage of fault." *Unzicker*, 203 Ill. 2d at 94.

Defendants contend that section 2–1706.5, like the statute in *Unzicker*, does not limit a plaintiff's recovery and merely provides that certain defendants can be held liable for noneconomic damages only up to a particular amount. We disagree with defendants' reading of the statute. By its plain terms, section 2–1706.5 limits a plaintiff's noneconomic damages. Section 2–1706.5 states, with respect to an award against a hospital and its personnel or hospital affiliates, that "the total amount of non-economic damages shall not exceed $1,000,000." 735 ILCS 5/2–1706.5(a)(1) (West 2008). Section 2–1706.5 similarly states, with respect to an award against a physician and the physician's business or corporate entity and personnel or health-care professional, that "the total amount of non-economic damages shall not exceed $500,000." 735 ILCS 5/2–1706.5(a)(2) (West 2008). Unlike the statute in *Unzicker*, which required the court to enter judgment in conformity with the jury's assessment of fault where the defendant was minimally responsible, the statute here requires the court to enter a judgment at variance with the jury's determination and without regard to the court's duty to consider, on a case-by-case basis, whether the jury's verdict is excessive as a matter of law. Defendants' attempt to fit this statute within the *Unzicker* analysis is unavailing.

Defendants also argue that the separation of powers clause "allows the legislature to enact statutes affecting the conduct of

litigation if its purpose is to serve legitimate legislative goals," and that the statute here, although affecting the conduct of litigation, is plainly intended to address a health-care crisis. In support, defendants rely chiefly on our analysis in *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21 (2001), upholding a statutory medical records disclosure provision against a separation of powers challenge.

Defendants' reliance on *Burger* is misplaced. As plaintiffs note, *Burger* did not involve a statute affecting the conduct of litigation. *Burger*, 198 Ill. 2d at 41. Although the plaintiff in *Burger* argued that the statute at issue impermissibly infringed upon the judiciary's inherent authority to regulate discovery, we concluded that the plain language of the statute did not did so, and therefore the statute did "not impinge upon the power of the judiciary." *Burger*, 198 Ill. 2d at 39, 45. Moreover, we discern no broad holding in *Burger* under which a legislative enactment that would otherwise run afoul of separation of powers principles will be deemed to pass constitutional muster simply because the enactment "serves legitimate legislative goals." The other precedents defendants cite are also inapposite. See *Chicago National League Baseball Club, Inc. v. Thompson*, 108 Ill. 2d 357, 364-66 (1985) (rejecting a separation of powers challenge to a statute subjecting night baseball games to noise emission standards); *Strukoff v. Strukoff*, 76 Ill. 2d 53, 57-60 (1979) (rejecting a separation of powers challenge to a statute which required a waiting period between the court's determination that grounds exist for dissolution of the marriage and the court's disposition of property).

This is not to say that the legislative purpose or goal of a statute is irrelevant to a separation of powers analysis. In *Burger*, *Thompson*, and *Strukoff*, we considered what the statutes required or regulated and the legislature's goals in enacting them. *Burger*, 198 Ill. 2d at 41; *Thompson*, 108 Ill. 2d at 364; *Strukoff*, 76 Ill. 2d at 60. Here, too, we necessarily consider what the statute purports to do–limit noneconomic damages in medical malpractice actions–and the legislature's goal in enacting the statute–responding to a health-care crisis. Our separation of powers analysis, however, does not stop there. The crux of our analysis is whether the statute unduly infringes upon the inherent power of the judiciary. That such an infringement was unintended, based on the language and stated purpose of the statute, does not resolve the constitutional infirmity.

Defendants stress that the General Assembly has the authority to change the common law, which the General Assembly has regularly exercised, and that invalidating section 2–1706.5 undermines that authority and calls into question this court's precedents upholding statutes that limit a plaintiff's damages. See *Bernier v. Burris*, 113 Ill. 2d 219 (1986); *Siegall v. Solomon*, 19 Ill. 2d 145 (1960); *Smith v. Hill*, 12 Ill. 2d 588 (1958).

The issue is not whether the General Assembly may change the common law. As we recognized in *Best*, the General Assembly's authority to "alter the common law and change or limit available remedies *** is well grounded in the jurisprudence of this state." *Best*, 179 Ill. 2d at 408, citing *Grand Trunk Western Ry. Co.*, 291 Ill. 167. See also *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 519 (2000) ("legislature has the inherent authority to repeal or change the common law and may do away with all or part of it"). The General Assembly's authority, however, is not absolute; it must be exercised within constitutional bounds. See, *e.g.*, *People v. Gersch*, 135 Ill. 2d 384, 395-98 (1990) (recognizing both the legislature's inherent power to alter the common law and the court's duty to invalidate unconstitutional actions of our legislature). Here, the legislature's attempt in section 2–1706.5 to limit common law damages in medical malpractice actions runs afoul of the separation of powers clause.

Invalidating section 2–1706.5 does not, as defendants claim, undermine this court's precedents. In *Bernier*, *Siegall*, and *Smith*, cited by defendants, we rejected constitutional challenges to statues that prohibited awards of punitive damages in actions for healing art malpractice, alienation of affections, and breach of promise to marry, respectively. In *Smith*, we expressly rejected a separation of powers challenge to the ban on punitive damages, stating:

> "With reference to the act violating article III of the constitution, we have already pointed out that the act does not affect compensatory damages, but only damages considered in their nature as punitive. The act in restricting recovery to actual damages, which term includes both general and special damages and encompasses compensatory damages because they are synonymous, does not invade any judicial functions of the courts. The act in barring punitive damages merely

establishes a 'public policy' that in the interest of society in the particular class of cases such damages should not be awarded. Such damages being allowed in the interest of society, and not to recompense solely the individual, to deny them cannot be said to deny any constitutional right or to encroach upon any judicial function, or to violate any constitutional guaranty of separation of powers." *Smith*, 12 Ill. 2d at 598.

Our analysis in *Smith* makes plain that a ban on punitive damages is not akin to a cap on noneconomic compensatory damages. Invalidating section 2–1706.5 thus does not call into question our holdings in *Bernier*, *Siegall*, and *Smith*.

Defendants further argue that if section 2–1706.5 is invalidated, statutes which limit common law liability cannot survive. See 745 ILCS 49/5 *et seq.* (West 2008) (Good Samaritan Act; eliminating negligence liability for certain health-care professionals and others who voluntarily engage in life-saving activities); 740 ILCS 90/1, 3.1, 3.2, 4 (West 2008) (Innkeeper Protection Act; limiting hotel's liability for loss or damage to guest property); 745 ILCS 65/4 (West 2008) (Recreational Use of Land and Water Areas Act; eliminating negligence liability of landowners who allow others to use their land free of charge for recreational or conservation purposes); 210 ILCS 50/3.150 (West 2008) (Emergency Medical Services (EMS) Systems Act; eliminating negligence liability for emergency providers of medical services); 730 ILCS 115/1(e) (West 2008) (Probation Community Service Act; eliminating negligence liability for organizations and individuals who agree to accept community service from offenders).

We decline to comment on the constitutionality of statutes that are not before us. We note, however, that, unlike section 2–1706.5, none of the statutes defendants cite requires a court to reduce a jury's award of noneconomic damages to a predetermined limit, irrespective of the facts of the case. Though the Innkeeper Protection Act does set a dollar cap for a hotel's liability for damage or loss to guest property, the statute also allows the parties to contract around the statutory limit. 740 ILCS 90/1, 3, 3.1, 3.2, 4 (West 2008). Thus, the Innkeeper Protection Act does not parallel section 2–1706.5.

Defendants direct this court's attention to statutes limiting noneconomic damages in medical malpractice cases that have been adopted in other states. See Alaska Stat. §09.55.549 (2007) ($250,000 to $400,000 cap); Cal. Civ. Code §3333.2 (West 2009) ($250,000 cap); Colo. Rev. Stat. §13–64–302 (2008) ($300,000 cap); Fla. Stat. §766.118 (2009) ($150,000 to $1,500,000 cap); Ga. Code Ann. §51–13-1(b) (2009) ($350,000 to $1,050,000 cap); Haw. Rev. Stat. §663–8.7 (2009) ($375,000 cap); Idaho Code Ann. §6–1603 (2008) ($250,000 cap); Md. Code Ann. Cts. & Jud. Proc. §3–2A–09 (2009) ($650,000 cap with $15,000 annual increase beginning January 1, 2009); Miss. Code Ann. §11–1–60(2)(a) (2008) ($500,000 cap); Mo. Rev. Stat. §538.210 (2009) ($350,000 cap); Nev. Rev. Stat. §41A.035 (2009) ($350,000 cap); N.D. Cent. Code §32–42–02 (2009) ($500,000 cap); Ohio Rev. Code Ann. §§2323.43(A)(2), (A)(3) (West 2009) ($250,000 to $1,000,000 cap); Okla. Stat. tit. 63, §§1–1708.1F, 1–1708.1F–1 (2009) ($300,000 cap which may be lifted in some cases); S.C. Code Ann. §15–32–220 (2008) ($350,000 to $1,050,000 cap with annual adjustment); Tex. Civ. Prac. & Rem. Code Ann. §74.301 (Vernon 2009) ($250,000 to $500,000 cap); Utah Code Ann. §78B–3–410 (2008) ($400,000 cap beginning July 1, 2002, plus yearly inflation adjustment); W. Va. Code §55–7B–8 (2008) ($250,000 to $500,000 cap, plus yearly inflation adjustment); Wis. Stat. §893.55(4)(d)(1) (2008) ($750,000 cap). Defendants contend that the limits on damages contained in section 2–1706.5 are well within the range of reasonable limits adopted by these states, and that the General Assembly is on solid constitutional footing when the lines it draws are "within the general area of limits that had been set by other States." *Anderson v. Wagner*, 79 Ill. 2d 295, 312 (1979).

We have reviewed the statutes defendants cite and observe that the limitations on noneconomic damages adopted in other states vary widely, not only in the amount of the cap, but other specifics. For example, the California statute provides simply: "In no [medical malpractice] action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)." Cal. Civ. Code §3333.2(b) (West 2009). In contrast, the Florida statute sets up a more complex scheme, in which the damages cap may be as low as $150,000 and as high as $1.5 million, depending upon whether the medical negligence is attributable to a practitioner or

nonpractitioner; the negligence results in a permanent vegetative state or death; the negligence caused a catastrophic injury to the patient; or the negligence occurred during the provision of emergency care. Fla. Stat. §766.118 (2009). On what basis defendants have determined that such disparate provisions are all reasonable is not known, and it is not for this court to judge the reasonableness of other states' legislation. Moreover, defendants' contention that because the damages caps established by section 2–1706.5 fit within the range of caps established by other states is not dispositive of whether section 2–1706.5 runs afoul of the separation of powers clause of this state's constitution. That "everybody is doing it" is hardly a litmus test for the constitutionality of the statute.

We are also not persuaded by defendants' argument that the circuit court's judgment should be reversed because courts of other states, which have considered whether a limitation on noneconomic damages violates separation of powers, have rejected this argument. Defendants cite *Garhart v. Columbia/HealthOne, L.L.C.*, 95 P.3d 571, 581-82 (Colo. 2004), *Zdrojewski v. Murphy*, 254 Mich. App. 50, 81-82, 657 N.W.2d 721, 739 (2002); *Judd v. Drezga*, 2004 UT 91, ¶36, 103 P.3d 135, and *Estate of Verba v. Ghaphery*, 210 W. Va. 30, 35, 552 S.E.2d 406, 411 (2001). Our own research reveals additional cases from other states rejecting separation of powers challenges to their statutes capping noneconomic damages in medical malpractice actions. See, *e.g.*, *Evans v. State*, 56 P.3d 1046, 1055-56 (Alaska 2002); *Kirkland v. Blaine County Medical Center*, 134 Idaho 464, 470-71, 4 P.3d 1115, 1121-22 (2000); *Owens-Corning v. Walatka*, 125 Md. App. 313, 335-39, 725 A.2d 579, 590-02 (1999); *Gourley v. Nebraska Methodist Health System, Inc.*, 265 Neb. 918, 955-56, 663 N.W.2d 43, 76 (2003).

Although decisions from other jurisdictions can provide guidance where precedent from Illinois is lacking, we do not write today on a blank slate. Our decision in *Best* guides our analysis. That the courts of other states would hold differently based on their constitutional jurisprudence applied to their statutes is of no moment. "This court's jurisprudence of state constitutional law cannot be predicated on *** the actions of our sister states ***." *People v. Caballes*, 221 Ill. 2d 282, 313 (2006).

We hold that the limitation on noneconomic damages in medical malpractice actions set forth in section 2–1706.5 of the Code violates the separation of powers clause of the Illinois Constitution (Ill. Const. 1970, art. II, §1) and is invalid. Because the Act contains an inseverability provision (Pub. Act 94–677, §995, eff. August 25, 2005), we hold the Act invalid and void in its entirety. We emphasize, however, that because the other provisions contained in Public Act 94–677 are deemed invalid solely on inseverability grounds, the legislature remains free to reenact any provisions it deems appropriate.

II

The partial concurrence and partial dissent is in agreement with the majority opinion on one relatively minor point (that this case presents a facial, and not an "as applied," constitutional challenge) and is otherwise opposed to the majority's legal analysis and holding. Therefore, for ease of discussion, we will refer to the partial concurrence and partial dissent simply as the "dissent."

Among the dissent's criticisms is that we have "rush[ed]" to address the constitutionality of Public Act 94–677; that we only "purport" to defend the constitution; and that we stand as an "obstacle" to the legislature's efforts to find an answer to the health-care crisis, "put[ting] at risk the welfare of the people." Slip op. at 33, 41, 52 (Karmeier, J., concurring in part and dissenting in part, joined by Garman, J.). The dissent implies that the majority opinion is somehow an affront to the health-care reform efforts of the Obama Administration, and expressly cautions that if we "persist in invalidating damages caps," dire consequences will likely follow. Slip op. at 27-28, 51 (Karmeier, J., concurring in part and dissenting in part, joined by Garman, J.).

Plainly, the Obama Administration's health-care reform efforts are not the backdrop against which we have decided the constitutionality of Public Act 94–677, and we express no opinion–favorable or otherwise–as to those efforts. Rather, our decision in this case, that Public Act 94–677 cannot stand, is based, as it must be, on the binding provisions of our state constitution and our case law interpreting the same. Although we do not expect that

the members of this court will always agree as to what the law is, or how to apply the law in a given case, we do expect that our disagreements will focus on the legal issues, providing a level of discourse appropriate to the state's highest court. The emotional and political rhetoric that peppers the dissent is ill-suited to this pursuit.

As to the legal issues the dissent does raise, we accept that, with respect to the applicability of the *Best* decision, the members of this court cannot speak with a unanimous voice. The dissent is as firm in its belief that *Best* was wrongly decided as the majority is in its conclusion that *Best* is as valid today as it was in 1997 and controls the disposition of the present case. Our reasons therefor have already been set forth above, and we find it unnecessary to reiterate those reasons in contradistinction to the dissent's views.

We are constrained, however, to respond directly to one issue raised by the dissent, namely, that this court lacks subject matter jurisdiction to consider the constitutionality of Public Act 94–677. Slip op. at 36 (Karmeier, J., concurring in part and dissenting in part, joined by Garman, J.). Because a reviewing court has a "duty to consider its jurisdiction and dismiss the appeal if it determines that jurisdiction is wanting," we will consider this issue. *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536, 539 (1984). See also *In re M.W.*, 232 Ill. 2d 408, 417 (2009) ("lack of subject matter jurisdiction is not subject to waiver").

The dissent's view that this court lacks jurisdiction is based on its conclusion that plaintiffs lack standing to challenge the constitutionality of Public Act 94–677 and that the constitutional issue is not ripe for review. Slip op. at 39 (Karmeier, J., concurring in part and dissenting in part, joined by Garman J.). As discussed below, issues of standing and ripeness do not implicate our subject matter jurisdiction.

The related doctrines of standing and ripeness "seek[ ] to insure that courts decide actual controversies and not abstract questions." *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 328 (1997). See also *Wexler v. Wirtz Corp.*, 211 Ill. 2d 18, 23, (2004) ("doctrine of standing is to insure that issues are raised only by those parties with a real interest in the outcome of the controversy"); *People v. Glisson*, 188 Ill. 2d 211, 221 (1999) (same); *Best*, 179 Ill. 2d at 382-84 (discussing ripeness with respect to

declaratory judgment statute); *Weber v. St. Paul Fire & Marine Insurance Co.*, 251 Ill. App. 3d 371, 372-73 (1993) ("whether an action is 'premature,' that is, not ripe for adjudication, focuses on an evaluation of the fitness of the issue for judicial decision at that point in time").

Under Illinois law, lack of standing is an affirmative defense, which is the defendant's burden to plead and prove. *Wexler*, 211 Ill. 2d at 22-23; *In re Estate of Schlenker*, 209 Ill. 2d 456, 461, 464 (2004); *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 494 (1988). While a lack of subject matter jurisdiction cannot be forfeited (*M.W.*, 232 Ill. 2d at 417), a lack of standing will be forfeited if not raised in a timely manner in the trial court (*Skolnick v. Altheimer & Gray*, 191 Ill. 2d 214, 237 (2000); *Greer*, 122 Ill. 2d at 508; *Lyons v. Ryan*, 324 Ill. App. 3d 1094, 1101 n.5 (2001)). Ripeness, like standing, is also subject to forfeiture if not raised in the trial court. *In the Interest of General Order of October 11, 1990*, 256 Ill. App. 3d 693, 696 (1993).

In the present case, Gottlieb and Martinoz did not assert in the trial court that plaintiffs lack standing, nor did they argue that the constitutional issue was not ripe for review. Thus, we deem these arguments forfeited by these defendants. Dr. Levi-D'Ancona, however, did assert lack of standing and ripeness as his first and second affirmative defenses, and moved for judgment on the pleadings as to these two defenses. The circuit court rejected Dr. Levi-D'Ancona's arguments and denied his motion for judgment on the pleadings. Relying on *Best*, the circuit court concluded that plaintiffs at least had standing to challenge the statutory cap on noneconomic damages and that the constitutionality of the statutory cap was ripe for review. The circuit court observed that catastrophic injuries similar to those pled by plaintiffs in the instant case were pled in the complaints at issue in *Best*, and that this court held that "plaintiffs have alleged a sufficient and direct interest in the application of the challenged provisions *** to their lawsuits." *Best*, 179 Ill. 2d at 383. Significantly, Dr. Levi-D'Ancona did not renew his standing and ripeness arguments before this court. Under our Rule 341, "[p]oints not argued [in the appellant's brief] are waived." 210 Ill. 2d R. 341(h)(7). Accord *Skolnick*, 191 Ill. 2d at 237 (this court "will not supply contentions not advanced by the parties").

Because issues of standing and ripeness do not implicate this court's subject matter jurisdiction, and because the only party who raised these issues below has abandoned them on review, we decline to address these issues on the merits.[4]

## CONCLUSION

For the reasons stated, we reverse the judgment of the circuit court finding the statute unconstitutional as applied to plaintiffs, affirm the judgment of the circuit court finding the statute facially invalid, and remand this matter to the circuit court for further proceedings.

*Affirmed in part and reversed in part;*
*cause remanded.*

JUSTICE THOMAS took no part in the consideration or decision of this case.

---

[4]The dissent's conclusion that standing and ripeness raise jurisdictional concerns which this court must address even if the parties have not done so might be worthy of consideration if this case was proceeding in federal court. Under federal law, standing is a threshold question under the case-or-controversy requirement of article III of the United States Constitution (U.S. Const., art. III, §2; *Warth v. Seldin*, 422 U.S. 490, 498, 45 L. Ed. 2d 343, 354, 95 S. Ct. 2197, 2205 (1975)), which plaintiffs bear the burden of pleading and proving (*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 119 L. Ed. 2d 351, 364, 112 S. Ct. 2130, 2136 (1992)). Accord *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 11-12, 159 L. Ed. 2d 98, 108-09, 124 S. Ct. 2301, 2308-09 (2004). Article III standing is jurisdictional and not subject to waiver. *United States v. Hays*, 515 U.S. 737, 742, 132 L. Ed. 2d 635, 642, 115 S. Ct. 2431, 2435 (1995). See also *Native American Arts, Inc. v. Waldron Corp.*, 253 F. Supp. 2d 1041, 1045 (N.D. Ill. 2003) (concluding that, by definition, article III standing is not an affirmative defense). This court is not required to follow federal law on issues of standing, and has expressly rejected federal principles of standing. See *Greer*, 122 Ill. 2d at 494 (holding that, in Illinois, lack of standing is an affirmative defense, and contrasting Illinois with federal courts "where lack of article III (U.S. Const., art. III) standing is a bar to jurisdiction").

JUSTICE KARMEIER, concurring in part and dissenting in part:

In a recent address to a joint session of the United States Congress, President Obama admonished that our nation's "collective failure to meet [the] challenge [of health-care reform]–year after year, decade after decade–has led us to the breaking point." Millions are unable to obtain health care coverage," he asserted; "medical costs are rising"; and the existing system is "placing an unsustainable burden on taxpayers." According to the President, the failure to take immediate corrective action will be dire: "Our deficit will grow. More families will go bankrupt. More businesses will close. More Americans will lose their coverage when they are sick and need it the most. And more will die as a result."

In outlining his strategy for addressing this crisis, the President advanced a multifaceted plan. Although his proposal focused on expanding health insurance coverage, he also recognized that reform of medical malpractice laws might aid in reducing our nation's health-care costs, while also improving the quality of care delivered by physicians and received by their patients.

That medical malpractice reforms might have salutary effects on the delivery of affordable health-care in Illinois was a view shared by our General Assembly when it enacted Public Act 94–677 in 2005. In enacting that law, the General Assembly specifically found:

> "This health care crisis, which endangers the public health, safety, and welfare of the citizens of Illinois, requires significant reforms to the civil justice system currently endangering health care for citizens of Illinois." Pub. Act 94–677, §101(4), eff. August 25, 2005.

The types of reforms which the legislature determined to be necessary were those which would

> "enhance the State's oversight of physicians and ability to discipline physicians, *** increase the State's oversight of medical liability insurance carriers, *** reduce the number of nonmeritorious healing art malpractice actions, *** limit non-economic damages in healing art malpractice actions, *** encourage physicians to provide voluntary services at free medical clinics, *** encourage physicians and hospitals to continue providing health care services in Illinois, and ***

encourage physicians to practice in medical care shortage areas." Pub. Act 94–677, §101(5), eff. August 25, 2005.

The majority's opinion contains a brief description of the measures adopted by the General Assembly to implement these objectives. To fully understand what the legislature hoped to accomplish, however, additional discussion of the particulars of the program may be helpful.

Section 310 of Public Act 94–677 amended the Illinois Insurance Code (215 ILCS 5/1 *et seq.* (West 2004)) to subject medical malpractice insurance carriers to greater oversight and reporting requirements. Pub. Act 94–677, §310, eff. August 25, 2005.

Section 315 revised the Medical Practice Act of 1987 (225 ILCS 60/1 *et seq.* (West 2004)) to modify certain aspects of the disciplinary process for physicians and create an internet-based system for providing public access to information regarding such matters as physicians' criminal and disciplinary histories, whether a physician's hospital privileges have been revoked or involuntarily restricted, and any medical malpractice judgments or arbitration awards which may have been entered against a physician. Pub. Act 94–677, §315, eff. August 25, 2005.

Section 330 (Pub. Act 94–677, §330, eff. August 25, 2005) amended the Code of Civil Procedure (735 ILCS 5/1–101 *et seq.* (West 2004)) by making various changes to the affidavit and written report requirements set forth in section 2–622 (735 ILCS 5/2–622 (West 2004)), including addition of a requirement that the reviewing health-care professional's written report contain the health-care professional's name, address, current license number and state of licensure. Section 330 of the Act also added a new section 2–1704.5 to the Code (735 ILCS 5/2–1704.5 (West 2006)), which allowed either party to elect to have payments for future medical expenses and cost of life care made to the prevailing plaintiff in a medical malpractice action through purchase of an annuity. Another new provision of the Code added by section 330 of the Act was section 2–1706.5 (735 ILCS 5/2–1706.5 (West 2006)). That statute created standards for economic and noneconomic damages, including establishment of limitations on the total amount of noneconomic damages which could be awarded to plaintiffs in a medical

malpractice action.[5] Two other changes to the Code made by section 330 of the Act were:

> (a) inclusion in section 8–1901 (735 ILCS 5/8–1901 (West 2006)) of a provision rendering inadmissible "[a]ny expression of grief, apology, or explanation" made by a health-care provider to a patient, a patient's family or a "patient's legal representative" regarding "an inadequate or unanticipated treatment or care outcome" provided within 72 hours of when "the provider knew or should have known of the potential cause of such outcome"; and

> (b) revision of section 8–2501 (735 ILCS 5/8–2501 (West 2006)) regarding expert witness standards.

Section 340 of the Act amended section 30 of the Good Samaritan Act (745 ILCS 49/30 (West 2006)) to expressly include retired physicians within its immunities and to add a provision allowing free clinics to receive reimbursement from the Illinois Department of Public Aid subject to the condition that any such reimbursements shall be used exclusively to pay the overhead expenses of operating the clinic and may not be used to provide a fee or other compensation to physicians or health care professionals receiving an exemption from liability under the law's provisions. Pub. Act 94–677, §340, eff. August 25, 2005.

Finally, article 4 of the Act (Pub. Act 94–677, §§401 through 495, eff. August 25, 2005), codified at 710 ILCS 45/401 *et seq.* (West 2006)), created a new Sorry Works! Pilot Program Act. The program was intended to assess whether prompt apologies by hospitals and physicians for errors in patient care accompanied by prompt offers of fair settlements have an effect on the costs the hospitals and physicians ultimately expend on healing art malpractice claims. The program was to be of limited duration, no more than two years unless

---

[5]In the case of awards against "a hospital and its personnel or hospital affiliates" based on medical malpractice, the total amount of noneconomic damages awarded to all plaintiffs is limited to $1 million. When the action is against "a physician and the physician's business or corporate entity and personnel or health care professional," the limit is $500,000. 735 ILCS 5/2–1706.5 (West 2006).

terminated sooner by the program's oversight committee. 710 ILCS 45/415 (West 2006). It also had limited participation. In its first year, it was to include just one hospital. The following year, provided the program was not terminated, one additional hospital could be added. 710 ILCS 45/405 (West 2006).

While the need for health-care reform has gained nearly universal recognition, the means for achieving that reform have been the subject of intense debate. Some fear that government-mandated changes will distort the health-care market, impede access to health-care resources and interfere with the physician-patient relationship. Others insist that unless the government takes strong and immediate action to overhaul the current system, the costs of medical care will exceed our society's ability to bear them, leaving increasing numbers of our citizens without access to vital health-care services.

The sentiments expressed by President Obama in his recent address to Congress and the action taken by our General Assembly through enactment of Public Act 94–677 are clearly premised on the latter view. Whether this view is a sound one is a judgment our court is not competent to render. Public policy determinations of this kind are ultimately a matter for the legislature. *Household Bank, FSB v. Lewis*, 229 Ill. 2d 173, 182 (2008). It is not our function to weigh the wisdom of legislation or decide whether the policy it expresses offends public welfare. *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 557 (2009). This is no less true in matters pertaining to health care. To the contrary, we have repeatedly noted that the General Assembly has wide regulatory power with respect to the health-care professions and that it is within the broad discretion of the legislature " 'to determine not only what the public interest and welfare require, but to determine the measures needed to secure such interest.' " *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 40-41 (2001), quoting *Chicago National League Ball Club, Inc. v. Thompson*, 108 Ill. 2d 357, 364 (1985).

In his partial dissent in *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52 (2006), another case involving physicians, Justice Freeman recently reminded us that

> " '[t]he primary expression of Illinois public and social policy should emanate from the legislature. This is especially true regarding issues like the present one, where there is

-31-

disagreement on whether a new rule is warranted. The members of our General Assembly, elected to their offices by the citizenry of this State, are best able to determine whether a change in the law is desirable and workable.

*** The General Assembly, by its very nature, has a superior ability to gather and synthesize data pertinent to the issue. It is free to solicit information and advice from the many public and private organizations that may be impacted. Moreover, it is the only entity with the power to weigh and properly balance the many competing societal, economic, and policy considerations involved.' " *Mohanty*, 225 Ill. 2d at 96 (Freeman, J., concurring in part and dissenting in part), quoting *Charles v. Seigfried*, 165 Ill. 2d 482, 493 (1995).

Our appellate court expressed the same principles this way:

"the authority to determine appropriate public policy is vested in the legislature, not the courts. [Citations.] This court has explained the reason that courts should be very cautious in establishing public policy:

'Courts are ill equipped to determine what the public policy should be. Seldom are all interested parties, all facts, and all issues present in a single case, where the court can rationally balance all the factors necessary to establish a policy good for society. Further, establishing public policy may entail the balancing of political interests. This is a function of the legislature, not the courts.' [Citation.]" *Board of Education of Dolton School District 149 v. Miller*, 349 Ill. App. 3d 806, 811 (2004).

Because the formulation and implementation of public policy are principally legislative functions, the courts afford substantial deference to legislative enactments. Under Illinois law, statutes carry a strong presumption of constitutionality. *People v. McCarty*, 223 Ill. 2d 109, 135 (2006). The burden of rebutting that presumption is on the party challenging the statute. The burden is a heavy one. The party challenging the law must clearly establish that it violates the constitution. *People v. Johnson*, 225 Ill. 2d 573, 584 (2007). If it is reasonably possible to uphold the constitutionality of a statute, a court must do so. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306-07

(2008). We cannot nullify a legislative enactment merely because we consider it unwise or believe it offends the public welfare. *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 558 (2009). For us to second-guess the wisdom of legislative determinations would, in fact, be prohibited by article II, section 1, of the Illinois Constitution of 1970, which expressly states that "[n]o branch shall exercise powers properly belonging to another." In my view, the majority's opinion today flatly violates this prohibition. While my colleagues purport to defend separation of powers principles, it is their decision, not the action of the General Assembly, which constitutes the improper incursion into the power of another branch of government.

One point on which I agree with the majority is that the circuit court erred in holding the statutory provision at issue here unconstitutional "as applied." For the reasons given by the majority, the only question properly before us is whether the statute is unconstitutional on its face. See slip op. at 6.

A facial challenge to the constitutionality of a legislative enactment, such as the one brought here, is the most difficult to mount because the circumstances in which a statute is facially invalid are so limited. The fact that the enactment could be found unconstitutional under some set of circumstances does not establish its facial invalidity. *Napleton v. Village of Hinsdale*, 229 Ill. 2d at 305-06. To successfully challenge a statute as unconstitutional on its face, one must show that the statute would be invalid under *any* imaginable set of circumstances. As long as there exists some situation in which a statute could be validly applied, a facial challenge must fail. *In re M.T.*, 221 Ill. 2d 517, 536-37 (2006).

Reduced to its essence, the majority's argument is that Public Act 94–677 is unenforceable because the limitation on noneconomic damages contained in section 330 of the Act, codified as section 2–1706.5 of the Code of Civil Procedure (735 ILCS 5/2–1706.5 (West 2006)), constitutes an impermissible encroachment upon the inherent power of the judiciary to correct jury verdicts through remittitur. In the majority's view, this conclusion is compelled by our prior decision in *Best v. Taylor Machine Works*, 179 Ill. 2d 367 (1997), which invalidated Public Act 89–7 based on a provision in the law which amended the Code of Civil Procedure by placing a

$500,000 cap on compensatory damages for noneconomic injuries in "all common law, statutory or other actions that seek damages on account of death, bodily injury, or physical damage to property based on negligence, or product liability based on any theory or doctrine." 735 ILCS 5/2–1115.1(a) (West 1996).

Before addressing the merits of the majority's analysis, there is a preliminary matter I feel constrained to raise. While I agree that a significant constitutional question is presented by the issue of whether the limits on noneconomic damages in medical malpractice actions imposed by section 330 of Public Act 94–677 violate separation of powers principles under our decision in *Best*, I question whether this particular case is an appropriate vehicle for resolving the question. That is so for two reasons. The first is jurisprudential. The second pertains to justiciability.

*Best* was decided more than a decade ago. Since that time, our court has applied the standards governing constitutional challenges to state statutes with heightened diligence. We made the point recently in *People v. Hampton*, where we held:

> "Shortly after the appellate court's opinion was entered in this case, this court reaffirmed our long-standing rule that 'cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort.' *In re E.H.*, 224 Ill. 2d 172, 178 (2006). We reminded courts that they must avoid reaching constitutional issues when a case can be decided on other, nonconstitutional grounds. *In re E.H.*, 224 Ill. 2d at 178. Constitutional issues should be addressed only if necessary to decide a case. *People v. Waid*, 221 Ill. 2d 464, 473 (2006), quoting *People ex rel. Sklodowski v. State of Illinois*, 162 Ill. 2d 117, 131 (1994). As noted in *E.H.*, this court has gone so far as to add a requirement to our rules that courts include a written statement that the decision cannot rest upon an alternate, nonconstitutional basis before deciding a case on constitutional grounds. *In re E.H.*, 224 Ill. 2d at 178, citing 210 Ill. 2d R. 18(c)(4) (effective September 1, 2006)." *People v. Hampton*, 225 Ill. 2d 238, 243-44 (2007).

Applying these principles in *Hampton*, we held that the appellate court had prematurely considered the constitutionality of the statute

challenged in that case and vacated the portion of its judgment addressing that constitutional issue. *People v. Hampton*, 225 Ill. 2d at 245. The same result is appropriate here.

In the case before us, the circuit court did enter an order under Rule 18(c)(4) in which it held that its judgment could not rest on an alternative, nonconstitutional ground. At this point, however, no basis for that finding exists. Should defendants prevail or should the damages awarded by the jury be less than the limits imposed under Public Act 94–677, judgment can certainly be entered without addressing the law's constitutionality.

To be sure, an immediate ruling on the validity of the law may yield efficiencies for the resolution of this particular case or other cases in which Public Act 94–677's limits on noneconomic damages hover as a potential constraint on a party's recovery. We have clearly held, however, that interests of efficiency or judicial economy do not justify addressing a constitutional issue before it is necessary to reach it. *People v. Hampton*, 225 Ill. 2d at 244-45.

Jurisprudential restraint regarding constitutional questions is not a principle we are free to follow or ignore as we see fit, for it goes to the very foundations of our tripartite system of government. As we explained in *Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 176 (2007),

> "[t]he Illinois Constitution establishes three coequal branches of government, each with its own powers and functions. Ill. Const. 1970, art. II, §1. The constitution declares that the legislative branch makes laws, and that the judicial branch decides cases. *** The determination of the constitutionality of a statute when not required to decide the case can impinge upon the lawmaking function of the legislature. [Citation.] The policy of prudential judicial restraint is grounded in those considerations that form the unique character of judicial review of government action for constitutionality. The policy is based on the delicacy of that function, the necessity of each branch of government keeping within its power, and the inherent limitations of the judicial process. [Citation.]"

By proceeding to the constitutional issue in this case, when doing so is not yet necessary for resolution of the case, the majority has

disregarded these fundamental principles. Under the reasoning of *Ultsch*, its decision impermissibly trenches upon the authority of the General Assembly.

A second and equally fundamental concern regarding whether it is appropriate for us to reach the constitutional question at this stage of the proceedings is justiciability. Article VI, section 9, of the Illinois Constitution of 1970 expressly provides that circuit courts have original jurisdiction over "all justiciable matters except when the Supreme Court has original and exclusive jurisdiction." In order to invoke the subject matter jurisdiction of the circuit court, a plaintiff's case, as framed by the complaint or petition, must therefore present a justiciable matter. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 334 (2002). See also *In re M.W.*, 232 Ill. 2d 408, 426 (2009).

Generally, a "justiciable matter" is " 'a controversy appropriate for review by the court, in that it is definite and concrete, as opposed to hypothetical or moot, touching upon the legal relations of parties having adverse legal interests.' [Citation.]" *In re M.W.*, 232 Ill. 2d at 424. In ascertaining whether a justiciable matter has been presented, courts consider various criteria including standing and ripeness. See *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 488 (2008). In the circuit court, Dr. Levi-D'Ancona. raised both these issues. He argued that plaintiffs lacked standing to challenge the statute or, in the alternative, that plaintiffs' challenge was not yet ripe for adjudication. The circuit court rejected Dr. Levi-D'Ancona's standing and ripeness challenges in so far as they pertained to plaintiffs' claim for a declaratory judgment that the portion of Public Act 94–677 adding section 2–1706.5 to the Code of Civil Procedure contravened the separation of powers provision of our state's constitution (Ill. Const. 1970, art. II, §1). In my view, however, that was error.[6]

_____

[6]Although Dr. Levi-D'Ancona did not argue the ripeness and standing issues in the brief he filed in our court, the issues should not be deemed to have been waived. Standing is not a procedural technicality, but rather is an aspect or component of justiciability. *Bridgestone/Firestone, Inc. v. Aldridge*, 179 Ill. 2d 141, 147 (1997). The same is true of ripeness. We have therefore held that when a plaintiff lacks standing to assert a claim or a dispute is not ripe for adjudication, the circuit court's judgment must be

Standing is an aspect of justiciability in which the primary focus is upon the personal stake in the outcome of the controversy of the person seeking the adjudication of a particular issue. The person seeking to invoke the jurisdiction of the court must have some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. See *Illinois Municipal League v. Illinois State Labor Relations Board*, 140 Ill. App. 3d 592, 598 (1986). This requirement is not excused in declaratory judgment actions. To the contrary, we have expressly held that standing is a preliminary question in all declaratory judgment actions. *Village of Chatham v. County of Sangamon*, 216 Ill. 2d 402, 419 (2005).

The doctrine of standing ensures that issues are raised only by parties with a real interest in the outcome of the controversy. Under the law of this state, standing is shown by demonstrating some injury to a legally cognizable interest. The claimed injury, whether actual or threatened, must be distinct and palpable, fairly traceable to the defendant's actions, and substantially likely to be prevented or redressed by the grant of the relief requested. In the context of a declaratory judgment action, " 'there must be an actual controversy between adverse parties, with the party requesting the declaration possessing some personal claim, status, or right which is capable of being affected by the grant of such relief.' " *Village of Chatham v. County of Sangamon*, 216 Ill. 2d at 419-20, quoting *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 493 (1988).

While the essence of the standing inquiry is whether a particular party is entitled to have the court decide the merits of a dispute, ripeness is concerned with the fitness of the issue for judicial decision at a particular point in time. See *Preferred Personnel Services, Inc. v. Meltzer, Purtill & Stelle, LLC*, 387 Ill. App. 3d 933, 938 (2009). In evaluating a ripeness challenge to a declaratory judgment action, the court considers whether a ruling on the dispute would be premature, for a "court cannot pass judgment on mere abstract propositions of

set aside for lack of subject matter jurisdiction. *People v. Capitol News, Inc.*, 137 Ill. 2d 162, 170 (1990). Lack of subject matter jurisdiction is not subject to waiver and cannot be cured through consent of the parties. *In re M.W.*, 232 Ill. 2d at 417.

law, render an advisory opinion, or give legal advice as to future events." See *Stokes v. Pekin Insurance Co.*, 298 Ill. App. 3d 278, 281 (1998) (upholding dismissal of action seeking declaration that insurance policy limits exceeded $100,000 on the grounds that underlying liability had yet to be determined and that bare allegations in complaint were insufficient to establish existence of actual controversy).

Where, as here, plaintiffs attack a statute as unconstitutional, they must bring themselves within the class as to whom the law is allegedly constitutionally objectionable. Whether the requisite standing exists must be determined on a case-by-case basis. *Messenger v. Edgar*, 157 Ill. 2d 162, 171 (1993). It is therefore pertinent to inquire who is and who is not complaining. Courts do not rule on the constitutionality of a statute where the complaining party is only theoretically affected by the alleged invalidity of the provision. See *Illinois Municipal League v. Illinois State Labor Relations Board*, 140 Ill. App. 3d at 599. To have standing to bring a declaratory judgment action challenging the validity of a statute, one must have sustained, or be in immediate danger of sustaining, a direct injury as a result of enforcement of the statute. *Village of Chatham v. County of Sangamon*, 216 Ill. 2d at 419-20.

The plaintiffs in this case have not yet prevailed on any of their medical malpractice claims against any of the defendants named in their complaint. The case remains at the pleading stage, and the allegations of malpractice contained in the complaint have been denied. Whether defendants will ultimately be found liable for plaintiffs' injuries and, if liable, whether plaintiffs will succeed in establishing a basis for an award of noneconomic damages in excess of the limits imposed by that portion of Public Act 94–677 adding section 2–1706.5 to the Code of Civil Procedure is therefore entirely speculative.

In the circuit court, the sole factual predicate advanced by plaintiffs in support of their assertion that they are already facing sufficient harm to satisfy standing requirements was the allegations set forth in their complaint. Plaintiffs' position is that those allegations are comparable to the allegations we found sufficient in *Best v. Taylor Machine Works*, 179 Ill. 2d at 383-84, when rejecting a ripeness challenge to the validity of the statute at issue there. There

is, however, in a fundamental difference between how the issue was raised in this case and how it came before us in *Best*. In *Best*, the particular question of ripeness was decided in the context of motions to dismiss under section 2–615 of the Code of Civil Procedure (735 ILCS 5/2–615 (West 2006)) filed by the *opposing parties*. *Best v. Taylor Machine Works*, 179 Ill. 2d at 382. The allegations in the complaint could therefore be taken as true. Here, by contrast, the matter was decided in the context of separate motions filed by plaintiffs and defendant Dr. Levi-D'Ancona under section 2–615 motions which were directed at *their own* respective pleadings. By electing to proceed in this way, plaintiffs and Dr. Levi-D'Ancona have conceded that the allegations in their respective pleadings are false in so far as they have been controverted by opposing pleadings. See *Christensen v. Wick Building Systems, Inc.*, 64 Ill. App. 3d 908, 912 (1978). As we have noted, Dr. Levi-D'Ancona has vigorously contested the factual basis for plaintiffs' claims against him. The factual basis which enabled our court to reject the ripeness challenge in *Best* is therefore absent here.

Our court has recognized that an issue which is otherwise nonjusticiable may nevertheless be examined when the magnitude or immediacy of the interests involved warrant action by the court. This so-called "public interest" exception arises most often when a matter has become moot and, in that context, requires (1) the existence of a question of public importance; (2) the desirability of an authoritative determination for the purpose of guiding public officers in the performance of their duties; and (3) the likelihood that the question will recur. *People v. Jackson*, 231 Ill. 2d 223, 228 (2008).

While this court has never extended the doctrine to cases where the problem with justiciability pertains to standing or ripeness, our appellate court has ruled that the reasoning of our "public interest exception" cases should also permit an exception to the ripeness doctrine. See *In re General Order of October 11, 1990*, 256 Ill. App. 3d 693, 696 (1993). Assuming, without deciding, that the appellate court's view is correct, invocation of the doctrine is not warranted here.

The public interest exception is construed narrowly and requires a clear showing of each element before it may be applied. *People v. Jackson*, 231 Ill. 2d 223, 228 (2008). That standard cannot be met in

this case. While it is evident that plaintiffs and the numerous entities which have filed friend of the court briefs are keenly interested in our views on the validity of the Public Act 94–677's caps on noneconomic damages, the law has been in effect since 2005. It is now 2010. To my knowledge, there has yet to be a single documented instance from any circuit in which any victim of medical malpractice has seen his or her award of noneconomic damages actually reduced pursuant to this statute.

Had such a reduction occurred, it would be easy to identify. There would be a specific court order reducing the plaintiff's recovery. That is so because, under the portion of section 330 of Public Act 94–677 (Pub. Act 94–677, §330, eff. August 25, 2005) adding section 2–1706.5 to the Code of Civil Procedure, the court is prohibited from informing the trier of fact of the existence of the statutory caps. The jury is therefore free to award any amount supported by the evidence and the principles governing liability. The caps are implemented by the court only if the jury's award exceeds the statutory maximum.

In some venues, the absence of affected judgments may be attributable to counsel's decision to forebear from proceeding to trial until they see how this case is resolved. I do not believe, however, that this explanation can account for the apparently universal absence of cases in which the statute has been applied to a plaintiff's detriment. Opponents of the statutory caps theorize that the caps are most likely to be triggered where substantial economic damages have been suffered. I point out later in this dissent that this assumption is flawed, but let us assume for purposes of the present discussion that it is valid. Given that resolution of this case could have no effect whatever on compensable economic damages, recovery of which is free from any statutory maximums, and considering the compelling financial incentives which always exist for recouping substantial economic losses as expeditiously as possible, I think it doubtful that every lawyer in every serious medical malpractice case in this state has refrained from prosecuting meritorious claims for economic damages merely because of the prospect that the amount of noneconomic damages his or her clients may recover may ultimately be subject to the caps at issue here. In any event, whatever the explanation, one can at least say this: there is nothing in the record

before us today that would justify bypassing the normal requirements for justiciability.

Under these circumstances, the majority's rush to address the constitutionality of Public Act 94–677 is not only inconsistent with established principles of appellate review and judicial restraint, it violates a central requirement imposed by article VI, section 9, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VI, §9). This is clearly impermissible. We have no business telling the General Assembly that it has exceeded its constitutional power if we must ignore the constitutional constraints on our own authority to do so.

Even if I agreed that this matter was properly before us for a decision on the merits, I could not concur in the majority's opinion. The majority bases its analysis on that portion of this court's decision in *Best v. Taylor Machine Works*, 179 Ill. 2d 367 (1997), which found that the cap on noneconomic damages contained in Public Act 89–7, eff. March 9, 1995, violated the separation of powers clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. II, §1). As Justice Bilandic noted in his special concurrence in *Best*, however, that opinion's discussion of "the constitutionality of the damage's cap under the separation of powers doctrine *** [was] wholly unnecessary and constitutes *dicta*." *Best*, 179 Ill. 2d at 471 (Bilandic, J., specially concurring). *Dicta* is not binding authority. *Geer v. Kadera*, 173 Ill. 2d 398, 414 (1996). Even a "judicial *dictum"* does not preclude reconsideration of a point of law. Nothing in any of this court's decisions, including its recent decision *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266 (2009), holds otherwise.

I note, moreover, that the legislation at issue here is substantially different from Public Act 89–7. Public Act 89–7 was a comprehensive tort reform package which imposed limits on noneconomic damages "[i]n all common law, statutory or other actions that seek damages on account of death, bodily injury, or physical damage to property based on negligence, or product liability based on any theory or doctrine." 735 ILCS 5/2–1115.1(a) (West 1996). By contrast, Public Act 94–677 represents an attempt by the General Assembly to deal in a focused and particular way with the health-care crisis it believed was threatening the health and welfare of our citizens.

-41-

A similar situation was recently faced by the Supreme Court of Ohio in *Arbino v. Johnson & Johnson*, 116 Ohio St. 3d 468, 2007-Ohio-6948, where it was called upon to consider the constitutionality of four tort-reform statutes implemented by Ohio's legislature in 2005. The plaintiff in that case argued that the statutes were functionally equivalent to laws which the courts had previously invalidated on, *inter alia*, separation of powers grounds, and that, under *stare decisis*, the court should be compelled to declare the new statutes invalid for the same reasons. In rejecting that argument, the court wrote:

> "While stare decisis applies to the rulings rendered in regard to specific statutes, it is limited to circumstances 'where the facts of a subsequent case are substantially the same as a former case.' [Citation.] We will not apply stare decisis to strike down legislation enacted by the General Assembly merely because it is similar to previous enactments that we have deemed unconstitutional. To be covered by the blanket of stare decisis, the legislation must be phrased in language that is substantially the same as that which we have previously invalidated.
>
> A careful review of the statutes at issue here reveals that they are more than a rehashing of unconstitutional statutes. In its continued pursuit of reform, the General Assembly has made progress in tailoring its legislation to address the constitutional defects identified by the various majorities of this court. The statutes before us here are sufficiently different from the previous enactments to avoid the blanket application of stare decisis and to warrant a fresh review of their individual merits." *Arbino v. Johnson & Johnson*, 116 Ohio St. 3d 468, 2007-Ohio-6948, at ¶¶23-24.

In my view, these considerations militate in favor of undertaking a new analysis, independent of what we may have said in *Best*, regarding validity of the damages caps established by section 330 of Public Act 94–677. However, even if I accepted, for the sake of argument, that the rationale of *Best* was otherwise controlling, I still could not join the majority's opinion.

The doctrine of *stare decisis* is never an inexorable command. When it is clear a court has made a mistake, it will not decline to

correct it, even if the mistake has been reasserted and acquiesced in for many years. *People v. Colon*, 225 Ill. 2d 125, 146 (2007). Indeed, while adherence to *stare decisis* is important to the stability of the law, when doubts are raised in the mind of the court as to the correctness of a prior decision, it is the court's *duty* to reexamine the question involved in the prior case. *Doggett v. North American life Insurance Co. of Chicago*, 396 Ill. 354, 360-61 (1947). Good cause exists to depart from *stare decisis* when serious detriment to the public interest is otherwise likely to result or where the precedent is poorly reasoned or has proven unworkable. *Tuite v. Corbitt*, 224 Ill. 2d 490, 506 (2006). As so defined, good cause exists to reject this court's separation of powers analysis in *Best*.

*Best*'s conclusion that legislative caps on noneconomic damages offend the separation of powers clause of the Illinois Constitution rests entirely on the notion that such caps are the equivalent of a remittitur, which courts alone have the authority to grant. For the reasons which follow, this proposition is untenable.

First, remittitur is not a power specifically vested in the courts by our constitution or the Constitution of the United States. It was introduced into American jurisprudence by Justice Story in *Blunt v. Little*, 3 F. Cas. 760 (D. Mass. 1822), a case he decided while sitting on circuit in the federal district court in Massachusetts. While the doctrine has gained acceptance in most United States jurisdictions, it has itself been challenged as an unconstitutional abridgment of the right to trial by jury. See *Dimick v. Schiedt*, 293 U.S. 474, 484, 79 L. Ed. 603, 610, 55 S. Ct. 296, 300 (1935) (recognizing validity of doctrine based on historical practice in the federal courts after 1822, but observing that "it *** may be that if the question of remittitur were now before us for the first time, it would be decided otherwise").

Debate over the propriety of judicial remittitur has been recurrent. As recently as 1985, for example, the doctrine of remittitur was abolished in Missouri by that state's supreme court, which noted that its "application in the appellate courts has been questioned since its inception in Missouri as an invasion of a party's right to trial by jury and an assumption of a power to weigh the evidence, a function reserved to the trier(s) of fact." *Firestone v. Crown Center Redevelopment Corp.*, 693 S.W.2d 99, 110 (Mo. 1985). The doctrine

exists in that state today only because it was subsequently authorized by the Missouri legislature. See *Myers v. Morrison*, 822 S.W.2d 906, 910 (Mo. App. 1991).

The view taken by the majority in this case that judicial remittitur enjoys special constitutional protection is therefore unsupported by the doctrine's origins and history. If anything, the opposite is true. The doctrine is constitutionally suspect. Accordingly, while remittitur may sometimes be employed by Illinois courts, it cannot, in any meaningful way, be viewed as an essential component of the judicial power vested in those courts by the Illinois Constitution of 1970.

Second, the majority's analysis perpetuates the misconception, followed in *Best*, that legislatively imposed limits on damages in civil cases are comparable to traditional judicial remittiturs. They are not. When a court reduces a jury award to comply with a statutory damages cap, it is in no sense reexamining a jury's verdict or imposing its own factual determination regarding what a proper award might be. Rather, it is simply implementing "a legislative policy decision to reduce the amount recoverable to that which the legislature deems reasonable." See *Estate of Sisk v. Manzanares*, 270 F. Supp. 2d 1265, 1277-78 (D. Kan. 2003); see also *Myers v. Central Florida Investments, Inc.*, No. 6:04–cv–1542–Orl–28DAB, slip op. at 20 (M.D. Fla. October 23, 2008). Because reduction of an award to comport with legal limits does not involve a substitution of the court's judgment for that of the jury, but rather is a determination that a higher award is not permitted as a matter of law, it is not a remittitur at all. See *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1330-31 (11th Cir. 1999).

Justice Miller correctly recognized this point in his partial dissent in *Best*. See *Best*, 179 Ill. 2d at 481 (Miller, J., concurring in part and dissenting in part). State courts of review considering damages caps in the wake of *Best* have uniformly reached the same conclusion. Rejecting *Best*, they have held that such caps are distinguishable from judicial remittiturs and constitute a legitimate exercise of legislative power. See *Arbino v. Johnson & Johnson*, 116 Ohio St. 3d 468, 2007-Ohio-6948, at ¶¶73-76 (statutory limit on noneconomic damages did not exceed legislature's power and impermissibly intrude on judicial power to decide damages); *Garhart v. Columbia/Healthone, L.L.C.*, 95 P.3d 571, 581-82 (Colo. 2004) ("[w]e *** join those states that

-44-

have upheld damages caps as not infringing impermissibly on the judicial role in the separation of powers"); *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 168-69, 594 S.E.2d 1, 8 (2004) (statutory damages caps are a proper exercise of legislature's policymaking authority, and because they do not grant the legislature the authority to reduce excessive awards on a case-by-case basis, they are not a form of remittitur); *Judd v. Drezga*, 2004 UT 91, ¶38, 103 P.3d 135 (statutory cap on noneconomic damages upheld against separation of powers challenge on the grounds that it was a permissible exercise of the legislature's power to declare what the law shall be, not an improper usurpation of the judiciary's function to decide controversies); *Gourley v. Nebraska Methodist Health System, Inc.*, 265 Neb. 918, 956, 663 N.W.2d 43, 77 (2003) (damages cap does not act as a legislative remittitur or otherwise violate principles of separation of powers because it does not ask legislature to review a specific dispute and determine the amount of damages. Instead–without regard to the facts of a particular case–the cap imposes a limit on recovery in all medical malpractice cases as a matter of legislative policy); *Waste Disposal Center, Inc. v. Larson*, 74 S.W.3d 578, 590 (Tex. App. 2002) (legislature had authority under state constitution to impose statutory damages cap and such cap is not an impermissible limit on judiciary's constitutional powers or jurisdiction); *Evans v. State*, 56 P.3d 1046, 1055 (Alaska 2002) ("damages caps cannot violate the separation of powers, because the caps do not constitute a form of remittitur"); *Zdrojewski v. Murphy*, 254 Mich. App. 50, 82, 657 N.W.2d 721, 739 (2002) (statutory limit on noneconomic damages in medical malpractice actions was legitimate exercise of legislature's authority to enact substantive law and did not impermissibly infringe on power of the judiciary to instruct jury and provide forum for redress of grievances); *Verba v. Ghaphery*, 210 W. Va. 30, 35, 552 S.E.2d 406, 411 (2001) (legislature may set reasonable limits on damage caps in civil actions without violating separation of powers principles); *Kirkland v. Blaine County Medical Center*, 134 Idaho 464, 471, 4 P.3d 1115, 1122 (2000) (statutory cap on noneconomic damages does not impermissibly infringe on the judiciary's traditional power of remittitur and was within the legislature's power to enact); *Guzman v. St. Francis Hospital, Inc.*, 2001 WI App. 21, ¶17, 240 Wis. 2d 559, 623 N.W.2d 776 (statute setting cap on noneconomic

damages does not interfere with court's discretion to order remittitur, and legislature's action in adopting damages cap does not violate separation of powers); *Owens-Corning v. Walatka*, 125 Md. App. 313, 335-39, 725 A.2d 579, 590-92 (1999) (it is within the power of the legislature to enact statutory caps, and such caps do not interfere with a litigant's right to a jury trial or infringe upon the judiciary's control over court proceedings); *Pulliam v. Coastal Emergency Services of Richmond, Inc.*, 257 Va. 1, 21-23, 509 S.E.2d 307, 319 (1999) (legislative damage caps do not invade the province of the judiciary).

In a law review note written shortly after *Best* was decided, a student at Northwestern University Law School opined that the court's remittitur analysis offered "a powerful new weapon in the arsenal of those opposed to damages caps." Note, *Best v. Taylor Machine Works, The Remittitur Doctrine, and the Implications for Tort Reform*, 94 Nw. U.L. Rev. 227, 272 (1999). As the foregoing discussion suggests, however, the weapon has proved to be a dud. With the exception of the majority's opinion today, *Best*'s remittitur analysis has not only been rejected by the federal courts, it has failed to carry the day in any reported decision in any other state in the United States since it was filed 12 years ago.

The majority makes the point that we should not follow a particular course of conduct merely because "everybody is doing it." Slip op. at 22. This is sound advice indeed, and I have always encouraged my children to follow it. Here is another useful tip: "It can be no dishonor to learn from others when they speak good sense." Sophicles, *Antigone* (trans. E. Wyckoff). In my opinion, the view taken by the other states and by the federal courts, namely, that statutory damages caps are not equivalent to remittitur, is eminently sensible and should be adopted in Illinois.

The separation of powers analysis in *Best* is flawed for another reason as well. It fails to acknowledge the legislature's constitutional power to make, amend, alter and abolish the laws of this state. See *Waste Disposal Center, Inc. v. Larson*, 74 S.W.3d at 590.

The power of our legislature to change the law is not limited to laws enacted by the General Assembly itself. It also extends to the common law. Our Common Law Act (5 ILCS 50/0.01 *et seq.* (West 2008)) expressly provides:

"The common law of England, so far as the same is applicable and of a general nature, and all statutes or acts of the British parliament made in aid of, and to supply the defects of the common law, prior to the fourth year of James the First, excepting the second section of the sixth chapter of 43d Elizabeth, the eighth chapter of 13th Elizabeth, and ninth chapter of 37th Henry Eighth, and which are of a general nature and not local to that kingdom, shall be the rule of decision, and shall be considered as of full force *until repealed by legislative authority*." (Emphasis added.) 5 ILCS 50/1 (West 2008).

Legislative authority in Illinois is vested in our General Assembly. Ill. Const. 1970, art. IV, §1. Consistent with these principles, it has long been recognized that "[t]he Illinois General Assembly has the inherent power to repeal or change the common law, or do away with all or part of it." *People v. Gersch*, 135 Ill. 2d 384, 395 (1990); *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 519 (2000). Indeed, our legislature has been "formally recognized as having a superior position to that of the courts in establishing common law rules of decision." *People v. Gersch*, 135 Ill. 2d at 395.

In accordance with its place in our constitutional and statutory order, the legislature possesses broad discretion to determine whether a proposed statute which would restrict or alter an existing remedy is reasonably necessary to promote the general welfare. *Bilyk v. Chicago Transit Authority*, 125 Ill. 2d 230, 245 (1988). It may not exercise that discretion in a way which is not rationally related to a legitimate government interest. As the majority points out, however, whether there is a rational basis for damages caps was not part of *Best*'s separation of powers analysis and is not relevant to the question before us today. Slip op. at 14-20.

Limitation or abolition of common law remedies by the legislature sometimes triggers challenges under article I, section 12, of the Illinois Constitution, which provides:

"Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly." Ill. Const. 1970, art. I, §12.

-47-

The courts have held, however, that even this provision does not prevent the legislature from doing such things as limiting the time within which an action may be brought, even if the statute could have the effect of barring a party's cause of action before the discovery of the ground for it; elevating the standard of care for tort liability from ordinary negligence to wilful and wanton negligence; or, most importantly for this case, restricting the type or amount of damages a party may recover. *Bilyk v. Chicago Transit Authority*, 125 Ill. 2d at 245.

The majority posits that the authority which the legislature would otherwise have to change the common law is constrained in this case by the separation of powers doctrine. For the reasons previously discussed, however, the cap on noneconomic damages imposed by section 330 of Public Act 94–677 in no way usurps the power of the judiciary. It is an altogether proper exercise of the legislature's authority to change the common law. Given that the legislature is fully empowered to alter common law remedies, it cannot contravene separation of powers principles when it exercises that power as it did in this case. See *Kirkland v. Blaine County Medical Center*, 134 Idaho at 471, 4 P.3d at 1122 ("[b]ecause it is properly within the power of the legislature to establish statutes of limitations, statutes of repose, create new causes of action, and otherwise modify the common law without violating separation of powers principles, it necessarily follows that the legislature also has the power to limit remedies available to plaintiffs without violating the separation of powers doctrine").

Faced with universal rejection of *Best*'s separation of powers analysis, the majority clings to the decision based on the principle that " '[t]his court's jurisprudence of state constitutional law cannot be predicated on *** the actions of our sister states ***.' " Slip op. at 23. But the passage they cite, which is from *People v. Caballes*, 221 Ill. 2d 282, 313 (2006) (*Caballes* II), is taken out of context. At issue in *Caballes* was whether a canine sniff constituted a "search" within the meaning of the Illinois Constitution. While some other states had found that canine sniffs were searches under their constitutions, the United States Supreme Court declared that they do not constitute a search for purposes of the fourth amendment to the United States Constitution. *Caballes* II reaffirmed that Illinois follows a limited

lockstep approach and that under that approach, the search and seizure provisions of the Illinois Constitution are to be interpreted the same way as corresponding provisions of the federal constitution. *Caballes*, 221 Ill. 2d at 315.

In reaching this conclusion regarding the relationship between cognate provisions of the Illinois and federal constitutions, we relied both on prior Illinois precedent and on the recognition that, in the end, it is the intent of the framers of the Illinois Constitution of 1970 and those who adopted it which controls our interpretation of its provisions, including whether those provisions are to be interpreted more expansively than federal law. *Caballes*, 221 Ill. 2d at 313. It is because the intent of the framers and the voters who approved the constitution must always be the guiding factor in construing that document that we made the statement, abbreviated by the majority, that our "jurisprudence of state constitutional law cannot be predicated on trends in legal scholarship, the actions of our sister states, a desire to bring about a change in the law, or a sense of deference to the nation's highest court." *Caballes*, 221 Ill. 2d at 313.

In the matter before us, no one is suggesting that our view of the separation of powers clause of the Illinois Constitution be predicated on anything other than the intent of those who framed and adopted the Constitution. The preeminence of that intent, however, does not preclude reference to how other courts have analyzed similar provisions under similar circumstances. In interpreting and applying the law of Illinois, our court regularly considers how courts in other jurisdictions have construed similar provisions of their law. See, *e.g.*, *People v. Pawlaczyk*, 189 Ill. 2d 177, 195 (2000); *P.R.S. International, Inc. v. Shred Pax Corp.*, 184 Ill. 2d 224, 238-39 (1998); *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 29-30 (1996); *People ex rel. O'Malley v. 6323 North LaCrosse Ave.*, 158 Ill. 2d 453 (1994); *People v. Wegielnik*, 152 Ill. 2d 418, 426 (1992); *Bernier v. Burris*, 113 Ill. 2d 219 (1986); *People ex rel. Latimer v. Board of Education of the City of Chicago*, 394 Ill. 228, 236 (1946). Moreover, as the foregoing authorities demonstrate, we have found it appropriate to consider the well-reasoned decisions of other jurisdictions not only when interpreting statutory provisions, but also when examining the protections afforded by the Illinois Constitution. We do this not because the views of the other states are in any way

controlling, but simply because the points they make may provide insight into the intent of those who drafted and approved our own laws.

No principle of appellate review bars us from following that same course here. Contrary to the apparent view of the majority, taking into account how other state courts have dealt with similar legal issues in similar circumstances is no threat to Illinois' sovereignty or the authority of Illinois' courts. It is simply good sense.

In summarizing the court's decision in *Best*, the majority repeated the argument made by the plaintiffs in that case that caps on non-economic damages were objectionable because they "impermissibly penalized the most severely injured persons." Slip op. at 9. A similar sentiment has been expressed with regard to the damages cap at issue in this case. It is a moving appeal to the human desire to provide for those in need. But at some point one must ask: is it true? Whether and to what extent a person sustains noneconomic injury is affected by many factors besides the severity of the physical harm he or she has suffered. In some cases, such as high wage earners whose injuries force them to miss work, major economic damages may be accompanied by relatively modest noneconomic loss. In other instances, a less serious but more traumatic injury may result in significant noneconomic damage but relatively minor economic loss. The total damages under both scenarios could be similar, yet the extent of the underlying physical injury could be substantially different. Contrary to the assumption of those who oppose Public Act 94–677, there would be no direct correlation between magnitude of the physical injury and the size of noneconomic loss sustained. As a result, application of the damages cap would not necessarily penalize the most seriously injured plaintiffs.

Of course, it is not difficult to imagine situations in which a severe injury is accompanied by both heavy economic losses and profound noneconomic damages. If the cap on noneconomic damages is truly problematic, however, one would expect to see situations in which its application has resulted in hardship. That has not happened. As I pointed out earlier in this dissent, we have yet to see a single instance in which the caps have even been triggered.

One must also wonder whether opponents of caps on noneconomic damages have fully considered the possible

consequences of declaring imposition of such caps to be beyond the legislature's authority. What the majority does not see or fails to acknowledge is that by focusing on the fortunes of individual plaintiffs, it looks at only a small part of the economic landscape. The cap on noneconomic damages is premised on the assumption that the potential for unlimited awards of such damages will imperil the availability of medical care to the population as a whole. There is nothing in the record in this case by which we can ascertain whether this assumption will prove correct in practice, but we cannot say the assumption is an unreasonable one. If it is correct, the cumulative harm from reduced access to medical treatment could easily overshadow the benefits a few individual plaintiffs stand to realize from abolition of damages caps. Should that happen, the equities will look far different than opponents of the caps have portrayed them.

Faced with this prospect, the General Assembly may respond to today's decision by eliminating *all* noneconomic damages in medical malpractice cases. Nothing in the majority's separation of powers analysis would preclude it from doing so. Indeed, the legislature could, without violating separation of powers principles, go so far as to abolish civil actions for medical malpractice completely and replace them with a claims system comparable to the one it has established for workers compensation. If the majority persists in invalidating damages caps, the legislature may be left with no alternative. If our legislature fails to act, while caps are eliminated in other states, imposition of restrictions by the federal government, which would not be constrained by state constitutional provisions, is a possibility. For those committed to insuring that victims of medical malpractice receive the maximum possible compensation for their injuries, these loom as sobering possibilities.

Illinois and the country are at a crossroads in the deepening struggle to manage the health-care crisis. As the legislative branch experiments with workable solutions, the courts must be vigilant about ensuring that the laws enacted by the General Assembly comport with constitutional requirements. In exercising our authority, however, we must remain mindful that the constitution constrains the courts as well.

In his partial dissent in *Best*, Justice Miller lamented that

"[t]oday's decision represents a substantial departure from our precedent on the respective roles of the legislative and judicial branches in shaping the law of this state. Stripped to its essence, the majority's mode of analysis simply constitutes an attempt to overrule, by judicial fiat, the considered judgment of the legislature." *Best*, 179 Ill. 2d at 487 (Miller, J., concurring in part and dissenting in part).

The same is true of the court's opinion today.

Our job is to do justice under the law, not to make the law. Formulating statutory solutions to social problems is the prerogative of the legislature. Whether there is a solution to the health-care crisis is anyone's guess. I am certain, however, that if such a solution can be found, it will not come from the judicial branch. It is critical, therefore, that the courts not stand as an obstacle to legitimate efforts by the legislature and others to find an answer. If courts exceed their constitutional role and second-guess policy determinations by the General Assembly under the guise of judicial review, they not only jeopardize the system of checks and balances on which our government is based, they also put at risk the welfare of the people the government was created to serve.

For all of the foregoing reasons, I respectfully concur in part and dissent in part.


JUSTICE GARMAN joins in this partial concurrence and partial dissent.